*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

VERONICA MCQUEEN,

        *Plaintiff-Appellant,*

    *v.*

BEECHER COMMUNITY SCHOOLS et al.,

        *Defendants-Appellees.*

No. 04-1777

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-70769—Bernard A. Friedman, Chief District Judge;
Paul J. Komives, Magistrate Judge.

Argued: September 19, 2005

Decided and Filed: January 5, 2006

Before: DAUGHTREY and MOORE, Circuit Judges; ALDRICH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Barry P. Waldman, SACHS WALDMAN, Detroit, Michigan, for Appellant. William R. Schulz, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, for Appellees. **ON BRIEF:** Barry P. Waldman, SACHS WALDMAN, Detroit, Michigan, Dean D. Elliott, Royal Oak, Michigan, J. Dallas Winegarden, Jr., WINEGARDEN & HIMELHOCH, Flint, Michigan, for Appellant. William R. Schulz, Deanna Swisher, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, for Appellees.

---

## OPINION

---

    KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Veronica McQueen ("McQueen"), mother of the decedent Jane Doe ("Doe"),[1] appeals the district court's order granting

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

[1] We use the pseudonym Jane Doe to protect the identity of McQueen's minor child. *Hodge v. Hurley*, 426 F.3d 368, 372 n.2 (6th Cir. 2005); *see also L.W. v. Grubbs*, 974 F.2d 119, 119 n.* (9th Cir. 1992) ("[B]ecause the disposition called for publication, the court has decided on its own motion to delete the full name of the plaintiff."), *cert. denied*, 508 U.S. 951 (1993).

summary judgment in the underlying § 1983 action to Defendants-Appellees Alicia Judd ("Judd")[2], Jimmie Hughes ("Hughes"), and the Beecher Community School District ("the School District").[2] McQueen contends that her daughter's substantive due process rights were violated when she was fatally shot in school by her classmate John Smith ("Smith"),[3] and that the district court erred in holding that she had failed to show the genuine issues of material fact necessary to maintain a direct state-created-danger claim against Judd, a supervisory liability claim against Hughes, and a municipal liability claim against the School District. McQueen also appeals the magistrate judge's order denying her motion for default judgment.

Because Doe's substantive due process rights were not violated, we **AFFIRM** the district court's judgment granting the defendants' motion for summary judgment. We **DISMISS** for lack of jurisdiction the appeal of the magistrate judge's order, because the parties did not first seek review in the district court.

## I. BACKGROUND

"The facts of this case are undeniably tragic." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 191 (1989). On February 29, 2000, Smith brought a gun to Buell Elementary School and fatally shot Doe, his first-grade classmate. Judd was the teacher of Doe and Smith, and Hughes was their principal. Buell Elementary School is part of the School District.

McQueen alleges that during the 1999-2000 school year, in the months leading up to the shooting, Smith was involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil. The School District had a policy of expelling students possessing dangerous weapons on school grounds. The School District's current superintendent testified that a pencil could qualify as a dangerous weapon under the policy, as could a pen or a book. Hughes never attempted to expel Smith for his attacks.

On the morning of the shooting, Smith brought to school a gun that he had obtained from his home. At about 9:45 A.M., Judd lined up her students in the hallway and led them to a computer class. Judd left Smith, Doe, and four other students behind as punishment for not doing their work. During this time, Smith took the gun out of his desk, inserted a magazine of bullets, threatened (but did not shoot) a student who had just entered the room, and finally shot Doe, who was sitting at her desk. At the moment of the shooting, Judd was standing about twenty-seven feet down the hall from the classroom.

McQueen brought suit under 42 U.S.C. § 1983, asserting that her daughter's substantive due process rights were violated. McQueen alleged claims against Judd under a theory of state-created danger, against Hughes under supervisory liability, and against the School District under municipal liability. McQueen moved for default judgment. The district court referred the motion to the magistrate judge, who denied the motion and a subsequent motion for reconsideration. The defendants moved for summary judgment, which the district court granted. McQueen now appeals both decisions.

---

[2]Before the district court, McQueen did not contest the motion for summary judgment as to Defendants Ira Rutherford, Casandra Ingersoll, and Cassandra Coney-Stewart. Although McQueen initially pursued an appeal as to Defendant Elaine Childerhose, she has now abandoned that claim.

[3]We use the pseudonym John Smith to protect the identity of a minor child. *Hodge*, 426 F.3d at 372 n.2; *see also Grubbs*, 974 F.2d at 119 n.*.

## II. ANALYSIS

### A.  Summary Judgment of § 1983 Claims

#### 1.  Standard of Review

"We conduct de novo review of decisions granting summary judgment, drawing all reasonable inferences in favor of the nonmoving party." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  Summary judgment is "rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  "To prevail, the nonmovant must simply show 'sufficient evidence to create a genuine issue of material fact.'" *Johnson*, 398 F.3d at 873 (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000)).  "Accordingly, to survive summary judgment in a § 1983 action, [McQueen] must demonstrate a genuine issue of material fact as to the following 'two elements:  1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law.'" *Id.* (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)).

#### 2.  Direct State-Created-Danger Claim Against Judd

McQueen argues that Judd violated Doe's right not to be deprived of life without due process, as secured by Fourteenth Amendment's Due Process Clause.  "[I]t goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (quoting *Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc)).  Therefore, the first § 1983 element — deprivation of a right secured by the Constitution or laws of the United States — is clearly satisfied.  The crux of this appeal, then, is the second element.  McQueen relies on the state-created-danger doctrine in support of her contention that even though Smith, a private actor, shot Doe, such deprivation of life was caused by a person acting under color of state law for purposes of § 1983.

The state-created-danger doctrine has its roots in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  There, the Supreme Court instructed that even in the face of "undeniably tragic" and "calamitous" circumstances — as when young Joshua DeShaney was severely beaten and permanently injured by his father after the state failed to remove the boy from his father's custody — "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 191, 197, 202.  But the Court acknowledged that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," *id.* at 198, explicitly recognizing that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being," *id.* at 199-200.[4]  The Court also seemed to leave the door open for another set of "limited circumstances" that would give rise to a state's affirmative duty to protect when it noted that "while the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

---

[4]The parties agree that this exception does not apply in this case, presumably in recognition of our prior holdings that there is no "special relationship" between a school and its students that gives rise to a constitutional duty. *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000); *Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996); *see also Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (approving the holdings of other circuits that there is no special relationship between school and student, but limiting its holding to the context of a school bus).

Every regional court of appeals, including this one, has walked through the door left open by the Court and recognized the state-created-danger theory of constitutional liability under § 1983. *Butera v. District of Columbia*, 235 F.3d 637, 648-49, 649 n.10, 651 (D.C. Cir. 2001) (citing cases from other circuits and recognizing the theory in its own circuit). In *Kallstrom*, we recognized the state-created-danger theory of due process liability and laid out three important requirements: an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability. 136 F.3d at 1066-67. We discuss each requirement in turn below.

### a. Affirmative Acts that Create or Increase the Risk

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* at 1066. In *Kallstrom*, we held that this first requirement was satisfied where a city "releas[ed] private information from [undercover] officers' personnel files" to defense counsel representing violent gang members whom the officers had investigated. *Id.* at 1067. Although we have sometimes assumed the affirmative-act-plus-risk-creation requirement to be satisfied,[5] *Kallstrom* remains the only time we have explicitly held it to be met.

In contrast, on numerous occasions we have rejected claims because the challenged conduct either was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff. *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005) (city's and officials' creation of a street and the management of traffic conditions); *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (police transport of the plaintiff from a place of greater danger — the shoulder of a highway — to a place of lesser danger — a convenience store parking lot); *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (police return of the plaintiff back to the home of the man who subsequently raped her, which was where police initially had found her and where she asked to be returned); *Jones v. Union County*, 296 F.3d 417, 430-31 (6th Cir. 2002) (police failure to serve an ex parte order of protection in a timely manner); *Weeks v. Portage County Exec. Offices*, 235 F.3d 275, 278-79 (6th Cir. 2000) (police failure to seek medical attention for already-injured plaintiff); *Summar v. Bennett*, 157 F.3d 1054, 1059 n.2 (6th Cir. 1998) (police disclosure of plaintiff confidential informant's identity to district attorney for inclusion in indictment of third party). In another case we did not explicitly apply the *Kallstrom* framework but made clear that the act did not create or increase the risk. *Sheets v. Mullins*, 287 F.3d 581, 588-89 (6th Cir. 2002) (the private violence was "too remote from [the] allegedly wrongful acts [police failure to arrest or more thoroughly investigate the eventual attacker] to support a finding of proximate cause"). Finally, we held in two pre-*Kallstrom* cases that the act did not create or increase the risk. *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (school board's and officials' various failures to provide for adequate response to a child's medical emergency on a school bus); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065-66 (6th Cir. 1994) (police failure to rescue and lies concerning the investigation).

McQueen argues that when Judd left Smith and several classmates, unsupervised, in the classroom while taking the rest of her students to another room down the hall, she committed a *Kallstrom* affirmative act that created a risk that Doe would be harmed by Smith. The district court

---

[5]In *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), where the police escalated the confrontation in an armed stand-off, we did not explicitly apply the *Kallstrom* framework, but we assumed that the affirmative-act-plus-risk-creation requirement had been met. *See id.* at 510 (noting that "it is not enough to show a causal connection between state action and an act of private violence"). The case was decided on the state culpability issue. In *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483 (6th Cir. 2002), another case that did not explicitly apply the *Kallstrom* framework, we "assume[d], without deciding, that the [corrections department's and officers'] actions and omissions increased the danger of [the plaintiff's] being harmed by an inmate at the prison." *Id.* at 493.

rejected this argument, finding that it was mere "hindsight deduction" to posit that Smith would not have been able to fire the gun if Judd had been in the room. J.A. at 56 (Dist. Ct. Op. and Order at 10).

We have not previously considered whether it constitutes an affirmative-act-plus-risk-creation under *Kallstrom* for a teacher to leave students — and more pertinently, the student who ultimately causes the injury — unsupervised.[6] The decisions reviewed above, however, provide enough guidance to conclude that Judd's leaving Smith and several of his classmates unsupervised in the classroom was not an affirmative act that created or increased the risk for purposes of *Kallstrom*. The cases most applicable to the situation here are those in which the state officials performed some act,[7] but we held that there was no affirmative act that created or increased the risk because the victim would have been in about the same or even greater danger even if the state officials had done nothing.

First, in *Cartwright*, the police picked up the plaintiff while he was walking at night on the side of the highway and dropped him off at a convenience store parking lot. 336 F.3d at 489. The plaintiff was hit by a truck two miles away. We rejected the argument that the police committed an affirmative act under *Kallstrom*, because the police transported the plaintiff from a more dangerous place to a less dangerous one. *Id.* at 492. In other words, if the police had done nothing, the plaintiff would have been in greater danger than that resulting from the officers' intervention. Second, in *Bukowski*, the police picked up the mentally-disabled plaintiff from a third party's home but returned her there after some investigation and repeated requests to do so by the plaintiff. 326 F.3d at 705-06. The plaintiff was subsequently raped by the third party. We rejected the plaintiff's argument that the police had committed an affirmative act under the state-created-danger theory, because the police had merely returned the plaintiff to a preexisting danger. *Id.* at 709. In other words, if the police had done nothing, the plaintiff would have faced just as much danger as she in fact faced after the officers' actions. These cases stand in stark contrast to *Kallstrom*, where the city's release of the officers' personnel files to the attackers' defense counsel was an affirmative act because it "substantially increased the officers' and their families' vulnerability to private acts of vengeance." 136 F.3d at 1067. If the city had not acted, then the attackers would not have access to this information and attacks would not be facilitated.

Judd's conduct is analogous to that of the officers in *Cartwright* and *Bukowski* and falls far short of the city's actions in *Kallstrom*. The danger to Doe was created by Smith's possession of a gun and Doe's presence in the classroom with him. This danger existed irrespective of Judd's location. If Judd had been in the room, there is no guarantee that, upon seeing the gun, she would have gotten to Smith in time to prevent the shooting; indeed, in a busy classroom, she may not have even noticed Smith's actions until the fatal moment. (Perhaps if Judd had been standing right next to Smith, she could have wrested the gun from him before he loaded and fired it. But there is no guarantee that Judd would have been so positioned if she had been in the room.) Also, there is no reason to believe that Judd's presence in the room would have discouraged Smith from drawing the weapon, as Smith's behavioral issues indicate that he did not shy away from misbehaving directly in Judd's view. Therefore, just as the plaintiffs in *Cartwright* and *Bukowski* would have faced at

---

[6]Indeed, it appears that we have only once addressed the state-created-danger theory on facts fitting the general pattern of this case (i.e., a state official allegedly creating the danger by leaving the violent private actor unsupervised). In an unpublished opinion, we simply assumed the existence of an affirmative act that created the risk but rejected the claim under the third *Kallstrom* prong. *See Duvall v. Ford*, No. 98-5777, 1999 WL 486531, at *3 (6th Cir. July 1, 1999) (unpublished opinion) (officials' decision to place the eventual attacker in a work release program with minimal supervision without checking his criminal background).

[7]The cases in which the state officials did nothing, *see Union County*; *Weeks*; *Sheets*; *Sargi*; *Gazette*, are inapplicable here because McQueen complains that Judd did *something*, i.e., leave the classroom.

least the same danger if the police had not acted, Doe would have faced the danger of Smith drawing his gun and firing at her even if Judd had not acted (i.e., if Judd had remained in the classroom at all relevant times).

McQueen relies principally on two decisions from other circuits to support her contention that Judd committed an affirmative act that created or increased the risk for state-created-danger purposes. McQueen first invokes *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), *cert. denied*, 508 U.S. 951 (1993), where a nurse employed by the state at a custodial institution for young male offenders was assaulted, battered, kidnaped, and raped by an inmate who had been assigned to work with her alone in the institution's medical clinic. *Id.* at 120. The Ninth Circuit held that defendants "affirmatively created the dangerous situation which resulted in [the nurse's] assault," *id.* at 122, which McQueen relies on to support her contention that Judd affirmatively acted to create or increase the danger here. But the court's recitation of the defendants' conduct highlights the difference between that case and the instant one:

> Defendants knowingly assigned [the inmate] to work with [the nurse] despite their knowledge that: (1) [the inmate] was not qualified to serve as a cart boy; (2) [the inmate] had an extraordinary history of unrepentant violence against women and girls; (3) [the inmate] was likely to assault a female if left alone with her; (4) [the nurse] would be alone with [the inmate] during her rounds; and (5) [the nurse] would not be prepared to defend against or take steps to avert an attack because she had not been informed at hiring that she would be left alone with violent offenders. . . . The defendants also enhanced [the nurse's] vulnerability to attack by misrepresenting to her the risks attending her work.

*Id.* at 121. The *Grubbs* defendants took the outright step of assigning an inmate with known violent tendencies toward women to work alone with the female plaintiff. Judd's walking out of the classroom cannot be characterized as such an overt act of danger-creation.

McQueen also cites *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir. 1993), where a high school student was sexually assaulted by a fellow student in the boys' shower at a high school for the mentally retarded that they both attended. *Id.* at 731. The plaintiff alleged that a school employee had suspected the occurrence of a sexual assault, so he "placed the boys in the shower together [the next day] 'to confirm his suspicions.'" *Id.* at 734. The court declined to address the significance of this allegation under the state-created-danger theory because it had been raised for the first time on appeal. *Id.* McQueen's reliance on *Dorothy J.* to support her argument that Judd committed an affirmative act to create or increase the risk is misplaced. Although it noted that "the significance of this . . . fact allegation" to the state-created-danger claim was "obvious," the Eighth Circuit expressly declined to address whether the school employee's conduct constituted an affirmative act. *Id.* Furthermore, even if the school employee's conduct had been held to be an affirmative act in *Dorothy J.*, the analogous conduct here would be if Judd had placed Smith, with a gun, and Doe together, on suspicion of his having shot at her before, in order to see if he would do it again. Simply walking out of the room without any inkling that Smith had a gun is different both in degree and in kind.

In sum, McQueen has not shown sufficient evidence to raise a genuine issue of material fact as to an affirmative act that created or increased the risk of private violence to Doe.

### b. Special Danger

In addition to an affirmative act, "plaintiffs alleging a constitutional tort under § 1983 [must] show [a] 'special danger.'" *Kallstrom*, 136 F.3d at 1066. We elaborated that a special danger exists "where the state's actions place the victim specifically at risk, as distinguished from a risk that

affects the public at large." *Id.* McQueen argues that this factor is satisfied because Doe was one of only five students that Judd left behind in the classroom with Smith. The district court assumed that this factor was satisfied.

As with the affirmative act requirement, we have set a high bar for the special danger requirement. In *Kallstrom*, we held that the second requirement was satisfied where the City's release of private information from undercover officers' personnel files "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy." 136 F.3d at 1067. But in several other cases — both before and after we fashioned the *Kallstrom* framework — we have rejected claims of a special danger. *See Schroder*, 412 F.3d at 729 (city's and officials' creation of a street and the management of traffic conditions posed a general traffic risk to pedestrians and other automobiles); *Union County*, 296 F.3d at 431 (failure to serve an ex parte order of protection in a timely manner);[8] *Jones v. City of Carlisle*, 3 F.3d 945, 950 (6th Cir. 1993) (city's allowing an epileptic to maintain a driver's license posed a danger to any citizen on the streets); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (release of a parolee only endangered plaintiff as a member of the public at large).

We believe that when five children are left in a room alone with an armed classmate, as was the case here, the children are much more like the few officers and family members at risk in *Kallstrom* than the general public at risk in *Schroder*, *City of Carlisle*, and *Janan*. Smith was much more likely to shoot the students in his immediate physical presence than a member of the general public. There are, of course, arguments to the contrary: (i) Smith could have walked out of the room and fired at those in the hallway or in other rooms; and (ii) he posed a risk to the general public both because he could have left the school with the gun and because even shots fired inside a school can pass through walls or windows to harm victims outside. The first counterargument is of no avail, because we have little difficulty assuming that if the relevant group included everyone in the school, the special danger requirement still would be satisfied. The latter argument misses the mark for a different reason. While we do not discount the risks Smith posed to those outside his school (i.e., the general public), those risks were smaller than and collateral to the risks faced by the five children present in the classroom with him. Surely an attack by the gang members in *Kallstrom* would have created analogous collateral risks to the general public, yet it was no bar to our holding that the officers and their families, who as the likely targets of such attacks were more likely to be harmed, faced a special danger. Therefore, McQueen has shown sufficient evidence to raise a genuine issue of material fact as to the existence of a special danger.

### c. State Culpability

In *Kallstrom*, we characterized the third element of the state-created-danger theory as a requirement that "[t]he state must have known or clearly should have known that its actions specifically endangered an individual." 136 F.3d at 1066. We have since clarified that the plaintiff "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). The government's conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense,'" but the standard is "'no calibrated yard stick.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 847 (1998)). "The guiding principle seems to

---

[8]In *Union County*, where the police failed to serve in a timely manner an ex parte order obtained by the plaintiff against her ex-husband, we held that the police did not commit an affirmative act, nor did it "place her *specifically* at risk." 296 F.3d at 431 (emphasis added). This holding might seem to suggest that in some circumstances even an endangered subset as small as a single person may not satisfy the special danger requirement. The following reading, however, is more logical and sensible. The general population was unprotected against the plaintiff's ex-husband's potential attacks. When the police failed to serve the ex parte order, the plaintiff was simply left as a member of the unprotected general population. Therefore, there was never a narrowing down to any subset, let alone a subset of one.

be that a deliberate-indifference standard is appropriate in 'settings [that] provide the opportunity for reflection and unhurried judgments,' but that a higher bar may be necessary when opportunities for reasoned deliberation are not present." *Bukowski*, 326 F.3d at 710 (quoting *Ewolski*, 287 F.3d at 511 n.5). Here, deliberate indifference is the appropriate standard because Judd had the opportunity to reflect and to deliberate before deciding to leave Smith and several children unsupervised in the classroom. Although public schools are busy places, Judd did not need to make a split-second decision that merits applying a higher standard. *See Ewolski*, 287 F.3d at 511 (discussing *Lewis*, in which the Supreme Court required a showing of malice and intent to harm for police involved in a high-speed vehicle chase, and *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), in which we required a showing that the police acted "maliciously and sadistically for the very purpose of causing harm" in the context of a shootout, *id.* at 359).

We have equated deliberate indifference with subjective recklessness, *Ewolski*, 287 F.3d at 513, which means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Subjective recklessness can "be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski*, 326 F.3d at 710.

McQueen argues that, based on Smith's history of behavioral problems, Judd knew that Smith might violently assault another student and acted recklessly in conscious disregard of that risk by leaving leaving Smith and several other children unsupervised in the classroom. The district court rejected this contention.

McQueen has failed to produce any evidence showing that Judd acted with deliberate indifference. It is difficult to put it better than Judge Friedman ably did in his decision below:

> [A]lthough Judd was aware of [Smith's] disruptive and sometimes violent behavior, no reasonable fact finder could conclude that she knew [Smith] would use a gun to kill another student if left unsupervised for a few minutes. Plaintiff does not claim that [Smith] ever specifically threatened to kill or seriously injure decedent [Doe] or any other student. Nor does plaintiff claim that prior to February 29, 2000, [Smith] had ever brought a gun or other dangerous weapon to school. Absent such evidence, it is impossible to conclude that defendant was on notice of a substantial risk to the students left alone in the classroom.

J.A. at 57 (Dist. Ct. Op. and Order at 11). McQueen has not alleged that Judd knew or even suspected that Smith had a gun, knife, or other similarly dangerous weapon with him on the day of the shooting, nor did Smith's history of behavioral problems suggest that he would escalate from hitting with fists, feet, and pencils to such weapons. Absent such evidence, McQueen cannot show that "the risk [of such a violent attack by Smith] was so obvious that [Judd] had to have known about it." *Bukowski*, 326 F.3d at 710. Therefore, McQueen has failed to raise a genuine issue of material fact as to state culpability.

### 3. Supervisory Liability Claim Against Hughes

McQueen argues that Hughes is liable under § 1983 on a supervisory liability theory for her failures to expel Smith, to train teachers to deal with violent students, to adopt policies protecting students from violent assaults, and to prevent teachers from leaving children unattended in classrooms. The district court held that Hughes is protected by qualified immunity.

Respondeat superior is not a proper basis for liability under § 1983. *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984). Nor can the liability of supervisors be based solely on the right to control

employees, *Bellamy*, 729 F.2d at 421, or "simple awareness of employees' misconduct," *Leary*, 349 F.3d at 903; *Bellamy*, 729 F.2d at 421. Furthermore, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays*, 668 F.2d at 874).

These principles make clear that a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor. For example, when we have addressed supervisory liability claims against principals and other school officials, it has been in the context of clear unconstitutional conduct by teachers. *See, e.g.*, *Doe v. City of Roseville*, 296 F.3d 431 (6th Cir. 2002) (sexual abuse by teacher); *Doe v. Claiborne County*, 103 F.3d 495 (6th Cir. 1996) (same). There is no such underlying unconstitutional conduct by subordinates here. As the discussion above of McQueen's direct state-created-danger claim against Judd demonstrates, McQueen has not produced sufficient evidence to raise a genuine issue of material fact that Judd (Hughes's subordinate) violated Doe's substantive due process rights. Because McQueen also has not pointed to unconstitutional conduct by any other employee supervised by Hughes, it necessarily follows that the supervisory liability claim against Hughes must fail.[9]

### 4. Municipal Liability Claim Against the School District

Finally, McQueen argues that the School District is liable under a theory of municipal liability, alleging that it failed to supervise students, failed to expel Smith, and failed to train teachers to properly handle violent students. The district court rejected this claim.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court "conclude[d] that a municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. *Monell* requires that in order "[t]o establish municipal liability pursuant to § 1983, a plaintiff must allege an unconstitutional action that 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or a 'constitutional deprivation[] visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003) (quoting *Monell*, 436 U.S. at 690-91 (1978)), *cert. denied*, 541 U.S. 1041 (2004).

As with supervisory liability, "[w]here . . . a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm." *Ewolski*, 287 F.2d at 516 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). As discussed above, neither Judd nor Hughes inflicted a constitutional harm upon Doe. "Because the [School District] can only be held liable if there is a showing of liability on the part of its officials, the determination that the [School District's] officials did not violate the plaintiff['s] constitutional rights resolves the claim against the [School District] as well." *Bukowski*, 326 F.3d at 712-13 (citing *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000), for the proposition that "the 'conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well'").

---

[9]Because Hughes did not violate Doe's constitutional rights, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### 5. Summary

Because McQueen has failed to show sufficient evidence to raise a genuine issue of material fact with respect to two of the three requirements under the state-created-danger theory, she has no viable direct claim against Judd. Without an underlying constitutional violation, McQueen cannot maintain her supervisory and municipal liability claims against Hughes and the School District, respectively. Therefore, the district court properly granted the defendants' motion for summary judgment on all three claims.

## B. Magistrate Judge's Denial of Motion for Default Judgment

Finally, McQueen argues that the magistrate judge erred in denying her motion for default judgment. If a magistrate judge is given plenary jurisdiction pursuant to 28 U.S.C. § 636(c)(1),[10] then "appeal to this court is 'in the same manner as an appeal from any other judgment of the district court.'" *McGraw v. Connelly (In re Bell & Beckwith)*, 838 F.2d 844, 848 n.5 (6th Cir. 1988) (quoting 28 U.S.C. § 636(c)(3)); *see also Ambrose v. Welch*, 729 F.2d 1084, 1085 (6th Cir. 1984) ("[I]f the statutory requirements [of § 636(c)] are met, either party may appeal this judgment directly to the court of appeals without seeking review in the district court."). Otherwise, we are "without jurisdiction to review the magistrate's order unless the parties have sought review in the district court." *Ambrose*, 729 F.2d at 1085.

Here, the district court referred McQueen's motion for default judgment to the magistrate judge for hearing and determination pursuant to 28 U.S.C. § 636(b)(1)(A).[11] In other words, the magistrate judge was not given plenary jurisdiction under § 636(c)(1). Because the parties did not seek review of the magistrate judge's order in the district court, we lack jurisdiction to review the magistrate judge's order denying McQueen's motion for default judgment.

## III. CONCLUSION

Jane Doe's senseless death was an undeniable tragedy, and we offer our most heartfelt condolences to those who knew and loved Jane. "Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [Jane] and [her] mother to receive adequate compensation for the grievous harm inflicted upon them." *DeShaney*, 489 U.S. at 202-03. "But our 'sympathy is an insufficient basis for approving a recovery' based on a theory inconsistent with law." *Schweiker v. Gray Panthers*, 453 U.S. 34, 48-49 (1981) (quoting *Potomac Elec. Power Co. v. Director, Office of Workers' Comp. Programs*, 449 U.S. 268, 284 (1980)). Thus, for the reasons set forth above, we **AFFIRM** the district court's judgment granting the defendants' motion for summary judgment and **DISMISS** for lack of jurisdiction the appeal of the magistrate judge's denial of McQueen's motion for default judgment.

---

[10]Section 636(c)(1) provides in relevant part, "Upon the consent of the parties, a . . . magistrate judge . . . may conduct any or all proceedings in a . . . civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court . . . ."

[11]Section 636(b)(1)(A) provides in relevant part, "a judge may designate a magistrate judge . . . to hear and determine any pretrial matter pending before the court, except [for certain enumerated motions]. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's . . . order is clearly erroneous or contrary to law."