Sheila KENNERLY, Administrator
of the Estate of Byron A.
Kennerly, Plaintiff,

v.

MONTGOMERY COUNTY BOARD
OF COMMISSIONERS, et al.,
Defendants.

No. C–3–01–465.

United States District Court,
S.D. Ohio,
Western Division.

March 17, 2003.

David Glen Roach, Hochman & Roach, Kevin A. Lantz, Hockman & Roach Co. LPA–3, Dayton, OH, for Plaintiff.

John Alan Cumming, John J. Danish, John C. Musto, Christopher Freeman Johnson, Freund Freeze & Arnold–3, Dayton, OH, for Defendants.

DECISION AND ENTRY SUSTAINING DEFENDANT MONTGOMERY COUNTY BOARD OF COMMISSIONERS' MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. # 10) AND OVERRULING, AS MOOT, SAID DEFENDANT'S MOTION TO EXCUSE IT FROM MANDATORY DISCLOSURES REQUIRED BY RULE 26(a) AND TO EXCUSE IT FROM RULE 26(f) CONFERENCE UNTIL COURT RULES ON PENDING MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. # 11); SUPPLEMENTAL CLAIMS ARISING UNDER STATE LAW ARE DISMISSED PURSUANT TO 28 U.S.C. § 1367(c)(3), WITHOUT PREJUDICE TO PLAINTIFF'S REFILING OF SAME IN STATE COURT; JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF ON FEDERAL CLAIM, SET FORTH IN COUNT I OF THE FIRST AMENDED COMPLAINT; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff Sheila Kennerly, on behalf of the Estate of Byron A. Kennerly, brings the underlying action against Defendants Montgomery County Board of Commissioners ("County") and B.I., Inc., alleging that the Defendants are liable for failing to prevent the shooting death of her late son, Byron Kennerly, who was shot and killed on July 13, 1999, by one Peter Atakpu. Prior to that date, Peter Atakpu had been on house arrest, under the supervision of the County, but had removed his home monitoring device and escaped the County's custody. In her First Amended Complaint ("FAC"), Kennerly has set forth five counts, one arising under federal law, 42 U.S.C. § 1983, and the other four arising under the law of the State of Ohio. The Court has jurisdiction over the federal claim, which is stated as to the County only, pursuant to 28 U.S.C. §§ 1331 & 1343(a)(3), and the state claims pursuant to 28 U.S.C. § 1367(a).

At issue is the County's Motion for Judgment on the Pleadings (Doc. # 10) and its Motion to Excuse it from Mandatory Disclosures Required by Rule 26(a) and to Excuse it from Rule 26(f) Conference Until Court Rules on Pending Motion for Judgment on the Pleadings (Doc. # 11). Because the Court finds the County's first motion well taken, it will be sustained, and its second motion shall be overruled, as moot. Furthermore, because the Plaintiff's federal cause of action does not remain viable, the Court shall dismiss her supplemental state law claims, without prejudice to their renewal in state court.

The Court will first set forth the facts of this case, and then discuss the County's Motion for Judgment on the Pleadings. As an prefatory note, the Court notes that the County's Motion was filed prior to the Plaintiff's having filed her First Amended Complaint. However, because the pleadings of the First Amended Complaint do not overcome the inherent deficiencies of her claim, the Motion remains viable.[1]

---

1. A previous action involving these parties was dismissed without prejudice on March 8, 2002. *See* Case. No. C–3–99–361. Also, the City of Dayton was named in the Plaintiff's original Complaint, but has since been dismissed. (Doc. # 20.) Finally, the Court notes that B.I., Inc., is a corporation that does business with Montgomery County, Ohio, and maintains its principal place of business in the State of Colorado. (FAC ¶ 9.) Because the Court does not need to consider the supplemental claims arising under state law, this Defendant's alleged role in this controversy need not be discussed in this Decision and Entry.

## I. *Factual Background*

For purposes of ruling on the County's Motion for Judgment on the Pleadings, the Court will assume the truth of the facts as stated in Kennerly's First Amended Complaint, and construe in her favor all reasonable inferences which can be drawn therefrom.

The Plaintiff, Kennerly, is the mother of Byron Kennerly, deceased. (FAC ¶ 3.) At the time of the events giving rise to this litigation, Kennerly and her son were neighbors of Peter Atakpu. (*Id.*) Peter Atakpu shot Byron Kennerly to death on July 13, 1999. (*Id.*) Prior to and up to the time of the shooting, Peter Atakpu was a convicted criminal in Montgomery County, known by the County to have had a dangerous and violent history and a tendency toward the same. (*Id.* ¶ 11.) Prior to the time of the shooting, he had been placed under house arrest by the Sheriff's Department, under the auspices of the County, and had been outfitted with a home monitoring device. (*Id.* ¶¶ 11–12.) At least twelve days prior to July 13, 1999, the County was warned and became aware that Peter Atakpu had removed and destroyed his home monitoring device, and had effectively escaped house arrest. (*Id.* ¶¶ 15 & 16.) The County was aware that Peter Atakpu, no longer under house arrest, might be prone to engaging in a murderous rampage. (*Id.* ¶ 16.) Despite this knowledge on its part, the County did not take any steps whatsoever to capture Peter Atakpu, or to warn the public or his neighbors, including Byron Kennerly, of his escape and the potential for criminal danger. (*Id.* ¶ 17.) On or before July 13, 1999, the County either adopted an official policy or custom allowing it to disregard the danger posed by Peter Atakpu, or it intentionally decided not to follow an existing policy or custom mandating that it take prompt action to capture him and to warn the public of the potential for criminal danger. (*Id.* ¶¶ 19 & 20.)

## II. *Analysis*

A party is allowed to move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure once the pleadings are closed, as they are at this time in this case. In reviewing such a motion, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 512 (6th Cir.2001).

42 U.S.C. § 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

In her § 1983 claim (Count I), Kennerly alleges that the County "violated Byron A. Kennerly's right not to be deprived of life, liberty, or property without due process of law and to be accorded equal protection of

the laws as guaranteed Byron A. Kennerly under the Fourteenth Amendment to the United States Constitution." (FAC ¶ 21.) In moving for judgment on the pleadings, the County contends that, given the underlying facts, as demonstrated by the factual allegations in the First Amended Complaint, accepted herein as true, Kennerly would be unable to prove, under any set of facts, that it is liable to her under § 1983 and the Fourteenth Amendment for the death of her son, Byron Kennerly. The Court agrees.

The Court's analysis begins with the Supreme Court's opinion in *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The plaintiffs in *DeShaney* were a minor who was the victim of his father's extreme acts of cruelty and abuse, and the minor's mother. 489 U.S. at 192–93, 109 S.Ct. 998. They sued the local Department of Social Services under § 1983, contending that it violated the minor's liberty interests under the Due Process Clause of the Fourteenth Amendment "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.* at 193, 109 S.Ct. 998. The lower courts ruled in favor of the defendant, on the basis that it could not be held liable for the private acts of violence committed by the minor's father. *Id.* The Supreme Court affirmed, noting at the outset of its opinion that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195, 109 S.Ct. 998. "[O]ur cases have recognized that the Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself

may not deprive that individual." *Id.* at 196, 109 S.Ct. 998.

If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id.* at 196–97, 109 S.Ct. 998 (footnote omitted).

The plaintiffs in *DeShaney* argued that the defendant assumed a "special relationship" with the minor by expressing an intent to protect him, and that it violated his due process rights when it failed to carry through with doing so. *Id.* at 197, 109 S.Ct. 998. "It's failure to discharge that duty, so the argument goes, was an abuse of governmental power that so 'shocks the conscience' . . . as to constitute as substantive due process violation." *Id.* (citation omitted). The Court rejected this argument, finding that the state only acquires a "special relationship" with individual citizens, such that it can be said it owes those individuals certain protections from invasions of liberty and the like, when it "takes a person into its custody and holds him there against his will." *Id.* at 199–200, 109 S.Ct. 998. In such cases, "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 200, 109 S.Ct. 998.

The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shel-

ter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.... The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. 998 (citations and footnotes omitted). It then stated, with regard to the case before it, that while "the State may have been aware of the dangers that [the minor] faced in the free world, it played no part in their creation, *nor did it do anything to render him any more vulnerable to them.*" *Id.* at 201, 109 S.Ct. 998 (emphasis added).

Following *DeShaney,* several circuit courts of appeals honed in on the latter sentiment, emphasized herein by the Court, and held that § 1983 claims against government bodies stemming from private acts of violence can lie, even if there is no "special relationship" between the victim and the government body, if a plaintiff can demonstrate that the government *did do something* to render the victim more vulnerable to known dangers. *See Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998) (noting cases recognizing the "state-created-danger" theory of liability). Following the lead of several of its sister circuit courts, the Sixth Circuit, too, held that a plaintiff could maintain a § 1983 action against a governmental body

on the basis of the state-created-danger theory of liability. *Id.* It noted that this theory of liability was based on the premise that "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own *affirmative acts.*" *Id.* (emphasis added).

Liability under the state-created-danger theory is *predicated upon affirmative acts* by the state which either create or increase the risk that an individual will be exposed to private acts of violence.

\* \* \* \* \* \*

However, because many state activities have the potential to increase an individual's risk of harm, we require plaintiffs alleging a constitutional tort under § 1983 to show "special danger" in the absence of a special relationship between the state and either the victim or the private tortfeasor. *The victim faces "special danger" where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large.*

\* \* \* \* \* \*

The State must have known or clearly should have known that *its actions specifically endangered an individual.*

*Id.* (emphasis added).

In *Kallstrom,* undercover police officers sued their municipal employer under a due process, deprivation of liberty theory, for releasing private information contained in their personnel files to the attorney for members of a particularly violent and odious gang, pursuant to a discovery request in a criminal drug conspiracy case stemming from an undercover investigation in which the officers had actively participated. *Id.* at 1059, 1067. Included in the personnel files, which the defense attorney allowed his gang member clients to

view, were the officers'· addresses and phone numbers, the addresses and phone numbers of immediate family members, the names and addresses of personal references, bank account information, their social security numbers, responses to questions about their personal lives asked during the course of polygraph tests, and copies of their driver's licenses. *Id.* at 1059. The Sixth Circuit held that the municipality could be held liable under a state-created-danger theory, stating:

> The City either knew or clearly should have known that releasing the officers' addresses, phone numbers, and driver's licenses and the officers' families' names, addresses, and phone numbers to defense counsel in the *Russell* case substantially increased the officers' and their families' vulnerability to private acts of vengeance. We therefore hold that the City's policy of freely releasing this information from the undercover officers' personnel files under these circumstances creates a constitutionally cognizable "special danger," giving rise to liability under §§ 1983.

*Id.* at 1067. For two reasons, the Court finds that this case is controlled by the outcome of *DeShaney,* not that of *Kallstrom,* and that, therefore, the County's Motion for Judgment on the Pleadings is well taken. *First,* it is apparent on the face of the First Amended Complaint that the Plaintiff will not be able to demonstrate that the County was aware of a potential harm to Byron Kennerly, *specifically. Second,* it is apparent on the face of the First Amended Complaint that the Plaintiff will not be able to demonstrate that the County took any *affirmative* act increasing the vulnerability of anyone, including By-

ron Kennerly, to danger. The Court will discuss these two issues in turn.

The First Amended Complaint avers that the purpose of placing the monitoring device on Peter Atakpu was "to protect the public, including, but not limited to Peter Atakpu's neighbors" (FAC ¶ 12), and that by doing so, the County "created and/or established a special relationship with the public, including, but not limited to Peter Atakpu's neighbors, which included Byron A. Kennedy, to protect the public from foreseeable violent and dangerous criminal acts by Peter Atakpu." (*Id.* ¶¶ 13 & 14.) The Plaintiff also avers that prior to Atakpu's criminal act of July 13, 1999, the County was aware that he had removed his monitoring device and had escaped home custody, and that it "intentionally and/or recklessly and/or with deliberate indifference to the consequences thereof, failed to take any steps whatsoever to warn the public, including, but not limited to Peter Atakpu's neighbors, which included Byron A. Kennerly, or capture Peter Atakpu." (*Id.* ¶ 17.)

■■■ While the pleadings suggest, as a matter of fact, that the County failed the public at large, and Byron Kennerly in particular, by not warning the public, or Byron Kennerly in particular, of the threat of danger posed by Peter Atakpu and by not attempting to recapture him, the pleadings are incorrect, as a matter of law, to the extent they imply the legal conclusion that the County assumed a special relationship with the public or a duty to take steps to warn the public, or Byron Kennerly in particular, about a potential criminal danger posed by its escaped house arrestee.[2] *DeShaney* and *Kallstrom*

---

**2.** It is to be remembered that only *factual* allegations must be accepted as true in ruling on a Rule 12(c) motion. Legal conclusions, artfully crafted as factual allegations, are irrelevant. Thus, the Plaintiff's allegation that the County "created and/or established a spe-

cial relationship with the public" (FAC ¶ 13), is disregarded herein. As a matter of law, it is an incorrect proposition, for the reasons stated in *DeShaney* and reiterated in *Kallstrom.*

make it clear that the government has neither a special relationship with the public nor a general duty to warn the public of potential threats of criminal danger, as a matter of constitutional law, and no such special relationship or duty arises merely on account of the local government having placed a known dangerous individual on house arrest and outfitted him with a monitoring device at a prior point in time.

 Furthermore, a plaintiff cannot plead around *DeShaney*, and come within the ambit of the result reached in *Kallstrom*, merely by naming a more particular sub-class of the public as the group to which the government owed a duty, such as one's "neighbors." Neighbors are still the public. *Kallstrom* is not ambiguous: the government must be aware that its actions will increase the vulnerability of a specific individual to criminal danger. For the same reason, one cannot plead around *DeShaney*, and come within the ambit of the result reached in *Kallstrom*, merely by naming an individual member of the public as one such "specific" individual to whom the government owed a duty. Obviously, if the government owed a duty to the public at large, or to a particular subgroup of the public, such as a group of neighbors, then that duty would run to any of the individual members of the public or group of neighbors, but since no such duty exists in the first instance, it follows that no such duty exists with respect to any individual member.

 Thus, even assuming the truth of the factual pleadings, which means assuming that the County was in fact aware that Peter Atakpu had removed the monitoring device, and in fact was aware that he posed a grave threat to the public, including his neighbors, and in fact had an official policy which allowed it to disregard the existence of such public threats, or, in the alternative, had an official policy to respond to such public threats to prevent any potential harm flowing therefrom but nevertheless intentionally disregarded it, the Plaintiff is not entitled to relief under § 1983. Absent the County taking an action that increased Byron Kennerly's vulnerability to danger at the hands of Peter Atakpu in a manner specific to him, in such a way that set him apart from the general public and from all of Peter Atakpu's other neighbors, the County cannot be held liable for the violence that Peter Atakpu committed upon him. No such allegation exists in the pleadings to support a finding or even an inference that the County took an action that increased the vulnerability of Byron Kennerly, specifically. The First Amended Complaint makes it evident that the duty or special relationship that the Plaintiff contends existed was one respecting the public at large, or, in its narrowest reading, all of Peter Atakpu's neighbors. Byron Kennerly was no differently situated to the County than Kennerly herself, or any other neighbor of Peter Atakpu's. Since, as a matter of constitutional law, the County had no special relationship with, and owed no duty to protect, Peter Atakpu's neighbors, including Byron Kennerly, the County is entitled to judgment on the pleadings.

The Court realizes that Rule 8(a)(2) of the Federal Rules of Civil Procedure establishes a "liberal pleading requirement," which requires only that a plaintiff plead a "short and plain statement of the claim showing that the pleader is entitled to relief," and that the Supreme Court has admonished the district courts not to impose a heightened pleading standard upon § 1983 plaintiffs. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *cf. Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). However, the advantages of our liberal pleading system do not require a court to

disregard rules such as Rule 12(c) and Rule 12(b)(6) when the pleadings are manifestly deficient. In this case, the Court is not subjecting the Plaintiff's First Amended Complaint to a heightened pleading standard. Rather, it is asking whether there is any possibility that the County could be held liable to the Plaintiff, based on the factual allegations contained in the First Amended Complaint, which the Court must accept as true, and any reasonable inferences which can be drawn therefrom. The answer is "no," because, under any set of facts, as a matter of law, the County had no special relationship with, nor owed a special duty to, the public in general, or Peter Atakpu's neighbors more narrowly. Because this is a principle of law, it will continue to hold true no matter how much discovery might be conducted. Accordingly, it would be impossible to conclude that the County had a special relationship, or owed a duty to, Byron Kennerly, specifically, merely because he was one individual member of the general public or of Peter Atakpu's group of neighbors.

 There is another reason, also, for concluding that this case is controlled by the outcome of *DeShaney*, and not that of *Kallstrom*. The difference lies in the difference between action and inaction. A government cannot be held liable for doing nothing to protect the public. *See DeShaney, supra; Kallstrom, supra; Jones v. Union County, Tenn.*, 296 F.3d 417, 428 (6th Cir.2002); *Ewolski v. City of Bruns-*

*wick*, 287 F.3d 492, 509 (6th Cir.2002); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir.1995); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065–67 (6th Cir. 1994). Liability under a state-created-danger theory must be predicated upon *affirmative acts*. There is not a single affirmative act complained of in the First Amended Complaint. The action of which the Plaintiff complains is inaction: the failure of the County to act. That is not enough.[3]

It is difficult to imagine a more profound set of facts supporting the argument that the state owes an individual a duty of protection when it knows of dangers specific to that individual than *DeShaney*. The Department of Social Services implicated in that case suspected and tracked the child abuse wrought upon the minor for over two years, from January, 1982, until March, 1984. Though it continued to collect and record ample evidence of abuse, it took no action to protect him. 489 U.S. at 192–93, 109 S.Ct. 998. Finally, in March of 1984, the boy was so severely beaten by his father that it was expected that he would spend the remainder of his life confined to an institution for the "profoundly retarded." *Id.* at 193, 109 S.Ct. 998. Although recognizing the gravity of these horrific facts, the Supreme Court held that the ongoing inaction of the Department of Social Services was not actionable as a violation of the Due Process

---

**3.** To the extent the Plaintiff might argue that the County's adoption of "official policies and/or informal customs or practices which allowed said defendants to disregard warnings and notices that a criminal on home arrest custody had removed a monitoring device and escaped custody" constitutes an affirmative act (*see* FAC ¶ 19), she would be wrong, as a matter of law. Even if true, which the Court must accept for the sake of ruling on the County's Rule 12(c) Motion, adopting a policy of disregarding the fact that a criminal on home arrest has escaped custo-

dy is no different than not adopting a policy, or simply ignoring an already-adopted policy, to respond affirmatively to such a circumstance in the first instance, which is what the Plaintiff alleges in ¶ 20 of the First Amended Complaint. However it is stated, the result is inaction respecting public safety, which is something quite different than an affirmative act increasing the vulnerability of a specific individual to danger. Such inaction on the part of local governments is to be dealt with at the ballot box; it does not violate the Constitution.

Clause, even though the consequences of its inaction were clearly foreseeable.

*Jones* is similarly instructive. In that case, the plaintiff had been coping with physical abuse at the hands of her ex-husband for over two years when she sought the latest in a series of protective orders. 296 F.3d at 421–22. Sheriff's deputies were unsuccessful in serving the ex-husband with the protective order at the address which they believed, erroneously, was his home address. *Id.* at 422. Despite this fact, they made no attempt to serve him at his place of employment, located in a neighboring county, or to seek assistance from the neighboring county's Sheriff, even though they knew the exact address of his employer, and they never called the plaintiff to inform her that her ex-husband had not been served. *Id.* About two weeks after the protective order issued, the plaintiff's ex-husband broke into her home and shot her several times. *Id.* She survived, and sued the county on, among other theories, a state-created-danger theory, due to the deputies' failure to serve her ex-husband with the protective order. *Id.* at 430. The Sixth Circuit rejected this argument, reaffirming that only affirmative acts on the part of a county can give rise to such liability; the fact that blatant inaction increases the vulnerability of an individual to danger does not, under *DeShaney*, give rise to a due process violation. *Id.* at 430–31.

The law flowing from these cases applies squarely to the § 1983 claim in the case at bar. To synthesize the two defects noted above, it can be remarked that in order for Kennerly to be able to maintain her cause of action, the allegations would have to suggest, expressly or inferentially, that the County took an affirmative act, placing the life of Byron Kennerly, specifically, in danger. The allegations would have to permit the inference to be drawn that the County's affirmative act was directed toward Byron Kennerly, specifically; not toward the public, and not toward Peter Atakpu's neighbors as a group. *See, e.g., Davis v. Brady,* 143 F.3d 1021 (6th Cir.1998) (holding that where officers release an inebriated individual from custody on a dark, busy highway, against his will, and the individual is subsequently struck by a car, a § 1983 claim can be pursued against the state on a state-created-danger theory of liability), *cert. denied,* 525 U.S. 1093, 119 S.Ct. 851, 142 L.Ed.2d 704 (1999); *Stemler v. City of Florence,* 126 F.3d 856 (6th Cir.1997) (holding that where officers order an individual, under threat of arrest, into the car of her obviously inebriated boyfriend, and shortly thereafter she is killed when her boyfriend wrecks his car on an interstate highway, a § 1983 claim can be pursued against the state on a state-created-danger theory of liability), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998). Kennerly's First Amended Complaint does not permit any such inference.

Simply stated, in the absence of an affirmative act directed toward a specific individual, *DeShaney* controls and the principle enunciated in *Kallstrom* is never reached.

For the reasons stated, the Court finds that the outcome of *DeShaney* controls this case. Therefore, the County's Motion for Judgment on the Pleadings (Doc. # 10) is SUSTAINED.[4]

---

4. The events giving rise to this action are unquestionably tragic, and when the pleadings are accepted for their truth, they reveal the existence of grossly imperfect county governance. Yet, neither the Constitution of the United States nor federal law imposes liability upon local governments for being imperfect. Such imperfections are dealt with through the democratic process, which is a creature of politics, not the federal civil justice system.

### III. *Conclusion*

For the reasons and citations of authority noted herein, the County's Motion for Judgment on the Pleadings (Doc. # 10) is SUSTAINED. Because it is now moot, the County's Motion to Excuse it from Mandatory Disclosures Required by Rule 26(a) and to Excuse it from Rule 26(f) Conference Until Court Rules on Pending Motion for Judgment on the Pleadings (Doc. # 11) is OVERRULED.

As a final matter, the Court notes that 28 U.S.C. § 1367(c)(3) grants this Court the discretion to refuse to exercise jurisdiction over supplemental claims arising under state law where the federal claim, over which the Court had original jurisdiction, has been dismissed. Because the Court finds that the § 1983 claim (Count I), over which it has original jurisdiction pursuant to 28 U.S.C. § 1331, is no longer viable, it finds that retaining jurisdiction over the supplemental state claims would not be appropriate. *See Brandenburg v. Housing Authority of Irvine,* 253 F.3d 891, 900 (6th Cir.2001) (stating that "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment") (citing *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Accordingly, said claims are dismissed. In dismissing said claims, the Court does not address their merits, and it does so without prejudice to Kennerly raising them anew in a state court of competent jurisdiction.

Judgment is to enter in favor of the Defendant and against the Plaintiff on the federal claim, arising under 28 U.S.C. § 1983, set forth as Count I in the First Amended Complaint.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.