SUTTON, J., delivered the opinion of the court, in which BUNNING, D.J., joined.
MOORE, J. (pp. 699-707), delivered a separate dissenting opinion.
*688 OPINION
SUTTON, Circuit Judge.
At 1:45 a.m. on October 8, 2001, Aaron Reynolds and Mustapha Atat began a drag race on a public street on the outskirts of Detroit. After roughly one-sixth of a mile, Reynolds lost control of his car and it veered into a crowd of spectators, striking Denise Jones and killing her. What separates this calamity from many others is that police officers from the City of Lincoln Park, a suburb of Detroit, arrived at the scene before the race and had an opportunity to prevent it from beginning. Not only did they fail to stop the race but, so far as this summary-judgment record shows, they also expressly allowed the participants to proceed with the race. For their part in this incident, the officers faced separate state-law criminal charges, a separate state-law civil lawsuit and eventually this § 1983 action, which claimed that the misconduct of the officers and the City of Lincoln Park violated Jones’ substantive due process rights.
When a claimant attempts to hold public officials responsible for private acts of violence under the Fourteenth Amendment, as this § 1983 action does, the depravity of the fact pattern often is enough to make “a devil[ ] sick of sin.” Wilfred Owen, Dulce Et Decorum Est (1918). This case is no exception. And when a claimant argues that government officials failed to prevent private individuals from causing another injury, as this § 1983 action does, DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and its progeny rarely permit the claim to go forward. This case is no exception. Because the officers did not have custody of Denise Jones at the time of the accident, because the officers’ actions did not place Denise Jones in any more danger than she voluntarily undertook before they arrived and because the officers’ participation in this tragedy did not specially place Denise Jones at any more risk than the 150-300 people attending the drag race, all relevant precedent requires us to uphold the judgment of the district court summarily rejecting this constitutional claim.
I.
In the early morning hours of October 8, 2001, four Lincoln Park police officers— William Kish III, Joseph Lavis, Douglas Muncey, Mohamed Nasser — came upon a crowd of individuals at the intersection of Fort Street and Outer Drive in the City of Detroit, which borders Lincoln Park. The crowd of individuals, as it turns out, were spectators awaiting the beginning of a drag race.
While the officers claim that they arrived at the scene five to ten minutes before the race, others claim that they arrived up to an hour before the race started. Several individuals saw officer Nasser approach the drag racers, speak briefly with Mustapha Atat, then return to his police car. Aaron Reynolds, the other drag racer, stated that he intended to abandon the race when the police arrived but proceeded with the race when officer Nasser told Atat that they could “go ahead and race.” JA 1041. One spectator claimed to have seen officer Nasser place a bet on the race after he talked to Atat. After the officers returned to their two police vehicles in the parking lot on the Lincoln Park side of the street, several bystanders heard one of the officers announce over his car’s public address system that “[w]e are not [here] to arrest anyone, go ahead with the race,” JA 1046, and then heard the officer play rap music over the public address system. The officers claim that they made no such announcement and played music for just “two seconds” and, even then, only to alert *689 the crowd that they were watching and intended to break up the gathering. Spectators estimated that the crowd ranged in size from 150-300 people and noted that the intersection of Fort Street and Outer Drive, which is in Detroit, was completely blocked by the race participants and spectators, preventing traffic into and out of Lincoln Park.
At about 1:45 a.m., the two cars raced north on Fort Street, which is in Detroit, away from the officers. Despite having been at the scene before the race began, the officers did not notify the Lincoln Park police dispatcher, as was department procedure, or attempt to break up the crowd aside from playing music over their public-address system, which was not department procedure. The cars proceeded north at 130 or so miles per hour before Reynolds lost control of his car about one-sixth of a mile from the start of the race. He veered into the crowd, and his car struck several spectators, including Denise Jones, who died from injuries suffered from the collision. After the accident, the officers contacted their dispatcher, who contacted Detroit police. Once the Detroit police arrived, the Lincoln Park police left without giving statements. The Lincoln Park Police Department learned that its officers had been at the scene of the accident only through subsequent media coverage.
The accident prompted several criminal and civil actions. Reynolds pleaded guilty to involuntary manslaughter, failure to stop at the scene of an accident resulting in death, two counts of felonious driving, and drag racing. Atat faced similar charges but fled the country before he could be prosecuted. Officers Nasser, Muncey and Lavis pleaded no contest to criminal charges of neglect of duty. On March 28, 2003, the Michigan circuit court granted a $25 million default judgment to Dorothy Jones, suing on behalf of the decedent, against the drivers. The court granted summary judgment against Jones on her state tort claims against the officers and the City of Lincoln Park, concluding that “the proximate cause” of the death was Reynolds alone. See Jones v. Reynolds, No. 250616, slip op. at *6 (Mich.Cir. Ct. Apr. 7, 2005); see also Mich. Comp. Laws § 691.1407(2); Robinson v. City of Detroit, 462 Mich. 439, 613 N.W.2d 307 (2000).
Pursuing further legal remedies, Dorothy Jones filed this § 1983 action against the officers and the City of Lincoln Park in federal district court. The district court granted summary judgment to the City and the officers on all of Jones’ claims. As to the officers, the court held that Jones “offered no evidence that they knew or had reason to know that the decedent specifically was in any more danger than any other citizen in the area that evening.” D. Ct. Op. at 19 (emphasis omitted). As to the City of Lincoln Park, the court held that there was “no evidence of an affirmative act by the City” or that the City knew or. should have known of the risk. Id. at 24. Jones challenges both conclusions on appeal, where we apply a de novo standard of review, Beecham v. Henderson County, 422 F.3d 372 (6th Cir.2005), view the evidence in the light most favorable to the non-moving party, Cox v. Ky. Dep’t of Transp., 53 F.3d 146 (6th Cir.1995), and will affirm a grant of summary judgment if the record evidence does not establish a genuine issue of material fact, Beecham, 422 F.3d at 374.
II.
Section 1983 provides a federal cause of action for civil damages against an individual acting under color of state law who deprives another of “rights, privileges, or immunities secured by the Constitution and laws.” 42 U.S.C. § 1983. In this *690 case, Jones argues that the officers violated the substantive due process guarantees of the Fourteenth Amendment when they failed to protect Denise Jones from the perils of an illegal drag race organized by private citizens on the streets of the City of Detroit. To overcome the officers’ qualified immunity from this individual-liability action, Jones must make two showings: that the officers violated the decedent’s constitutional rights and that those rights were “clearly established” at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court has told lower courts that they “must” address the “initial inquiry” before reaching the “clearly established” question. Id.
A.
“[N]othing in the language of the Due Process Clause itself,” the Court has instructed, “requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.” DeShaney v. Winnebago County Dep’t of Soc. Servs., 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). While “[a] State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes,” the Court has reasoned that such duties will not be “thrust upon them by this Court’s expansion of the Due Process Clause of the Fourteenth Amendment.” Id. at 202-OS, 109 S.Ct. 998. The Court has recognized one exception to the DeShaney rule: When the State has so restrained the liberty of the individual that it renders him unable to care for himself, the State has a special relationship with the individual and thus an affirmative duty to protect him. Id. at 200, 109 S.Ct. 998. “The affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.” Id. Accordingly, “it is the State’s affirmative act of restraining the individual’s freedom to act on his own behalf— through incarceration, institutionalization, or other similar restraint of personal liberty — which is the deprivation of liberty triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.” Id. (internal quotation marks omitted).
Since DeShaney, this circuit has recognized a second exception to the prohibition against holding public officials constitutionally responsible for private acts of violence. Relying on the following language from DeShaney — “[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them,” id. at 201, 109 S.Ct. 998—we have held that when the State “cause[s] or greatly increased] the risk of harm to its citizens ... through its own affirmative acts,” it has established a “special danger” and a duty to protect its citizens from that risk. Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir.1998). To bring a “state created danger” claim, the individual must show: “(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state’s actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.” Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir.2003); see Kallstrom, 136 F.3d at 1066.
*691 B.
In this case, Jones has not argued that the officers placed Jones in custody or otherwise restrained her liberty in a way that prohibited her from taking care of herself. The custodial or special-relationship theory of liability thus does not apply. Cf. Stemler v. City of Florence, 126 F.3d 856, 868 (6th Cir.1997) (“[T]he officers took the affirmative act of restraining [the individual’s] freedom to act on her [own] behalf, and consequently imposed upon themselves a duty to ensure that they were not placing her in danger. Their actions were, in the words of DeShcmey, a restraint on [her] personal liberty, not a failure to act on her behalf.”) (internal quotation marks omitted). That leaves the possibility that Jones can establish a “state created danger.” In our view, she cannot satisfy this “demanding standard for constitutional liability.” Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 913 (6th Cir.1995).
1.
Jones cannot show that the officers engaged in a cognizable “affirmative act” that “created” this “danger.” “There is no evidence that [the officers] took any affirmative action that exposed decedent to any danger to which she was not already exposed.” Sargi, 70 F.3d at 913. Nothing in the record indicates that the race would not have proceeded if the officers had never arrived at the scene. And nothing in the record indicates that the officers made Jones “more vulnerable” to the risk that she had already undertaken by voluntarily choosing to watch the race. Gazette v. City of Pontiac, 41 F.3d 1061, 1065 (6th Cir.1994) (“[A] duty to protect can arise in a non-custodial setting if the state does anything to render an individual more vulnerable to danger.”); see Ewolski v. City of Brunswick, 287 F.3d 492, 509 (6th Cir.2002) (holding that officials’ “affirmative actions” must “directly increase the vulnerability of citizens to danger or otherwise place citizens in harm’s way”); Kallstrom, 136 F.3d at 1066 (“[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts.”); Peach v. Smith County, 93 Fed.Appx. 688, 691 (6th Cir.2004) (holding that “no evidence exists that the Smith County defendants’ actions created the danger at issue” when they failed to seize all weapons during an arrest and the arrestee later shot and killed his girlfriend).
Jones also cannot establish that the officers “increased” her risk of danger when they failed to stop the race. The officers, it is true, came upon an illegal drag race and failed to stop it — or at least discourage it if, as appears to be the case, the race was being held on streets beyond their jurisdiction. But a “failure to act is not an affirmative act under the state-created danger theory,” Cartwright, 336 F.3d at 493 — as numerous cases demonstrate, see Schroder v. City of Fort Thomas, 412 F.3d 724, 728-29 (6th Cir.2005) (failing to respond to parental complaints about the lack of enforcement of a residential speed limit in a specific neighborhood was not an affirmative act); Jones v. Union County, 296 F.3d 417, 431 (6th Cir.2002) (failing to serve an ex parte protection order on an abusive spouse was not an affirmative act); Sheets v. Mullins, 287 F.3d 581, 588-89 (6th Cir.2002) (failing to pursue and investigate a domestic-disturbance call was not an affirmative act); Weeks v. Portage County Executive Offices, 235 F.3d 275, 279 (6th Cir.2000) (failing to call an ambulance for an obviously injured citizen was not an affirmative act); Sargi, 70 F.3d at 912-13 (failing to obtain *692 immediate medical assistance for seizure victim and instead taking her home was not an affirmative act); Robinson v. Twp. of Redford, No. 04-1117, 2005 U.S.App. LEXIS 15003, at *15 (6th Cir. July 20, 2005) (failing to search a room after the report of a break-in was not an affirmative act); Bullard v. Inkster Hous. and ReDev. Comm’n, 126 Fed.Appx. 718, 720 (6th Cir.2005) (failing to provide adequate security measures for apartment door to prevent break-ins was not an affirmative act); Peach, 93 Fed.Appx. at 691 (failing to respond to a call informing police that a woman battered by her husband was returning to spend time with him and that he had a gun was not an affirmative act); cf. Doe v. Claiborne County, 103 F.3d 495, 510 (6th Cir.1996) (pre-Kallstrom case stating that failing to protect a student from sexual harassment and a rape by another student did not violate substantive due process).
Whether the conduct of government officials in some cases should be treated as a failure to act or as action “may be a difficult question in the abstract,” Bukowski, 326 F.3d at 709, but we have always treated governmental conduct as “falling] on the inaction side of the line,” id., when it does not create or increase the risk of peril posed by the private actor. See May v. Franklin County Com’rs, 437 F.3d 579, 585 (6th Cir.2006) (act of dispatching officers to the scene of a domestic dispute did not increase the risk of harm to the victim and thus did not constitute an affirmative act); id. (“Thus even when we accept the testimony of plaintiffs expert, which we must do at the summary judgment stage, May has not produced any evidence that the appellees’ act of dispatching an officer to the scene increased the risk of harm to Kirk.”); McQueen v. Beecher Cmty. Sch., 433 F.3d 460, 467 (6th Cir.2006) (act of leaving students unsupervised in a classroom, after which one student shot another, did not increase the risk of harm to the victim and thus did not constitute an affirmative act); Jackson v. Schultz, 429 F.3d 586, 591-92 (6th Cir.2005) (act of placing a patient in the back of an ambulance did not increase the risk of harm to the victim and thus did not constitute an affirmative act); Gazette, 41 F.3d at 1065 (act of lying to the victim’s family about the extent to which a kidnapping had been investigated did not increase the risk of harm to the victim and thus did not constitute an affirmative act); Robinson, 2005 U.S.App. LEXIS 15003, at *14 (act of assuring shopkeeper that intruder had left the scene did not increase the risk to the victim and thus did not constitute an affirmative act). As these cases indicate, when state action or inaction “neither increased] decedent’s risk of harm nor render[s] her more vulnerable,” Sargi, 70 F.3d at 913, the plaintiff cannot establish a cognizable “affirmative act.”
Nor can Jones escape this conclusion by emphasizing that the drag racers planned to abandon the race once they saw the officers and would not have proceeded with the race had the officers not told them they could do so. “The question is not whether the victim was safer during the state action, but whether [she] was safer before the state action than [she] was after it.” Cartwright, 336 F.3d at 493. No evidence indicates that the drag race would not have proceeded had the officers never arrived, and no evidence indicates that the officers’ actions, whether characterized as allowing the race to proceed or as encouraging it, increased the risk to spectators at the race in general or to Jones in particular. To the contrary, the lead premise of Jones’ claim is that the drivers were prepared to start the race until the officers came and would have abandoned the race had the officers told *693 them to leave. When the officers nonetheless permitted the race to start, however, plaintiff cannot show that they aggravated the risk of harm to Denise Jones beyond the perils she already faced by voluntarily choosing to watch a drag race on city streets at 1:45 in the morning.
In Bukowski v. City of Akron, 326 F.3d 702 (6th Cir.2003), we faced a similar affirmative-act problem. Relying on internet communications, a 39 year old male (Hall) manipulated a mentally disabled 19 year old girl into traveling nine hours by bus to his home, where he raped her. Wdien the parents learned that their daughter was missing, they contacted the police who eventually obtained custody of the girl. Soon after being brought into custody, the girl said that she wanted to return to the man’s home. Because the police did not believe that they had authority to detain the girl (even though they thought she was “slow,” id. at 706) and because her parents had not yet arrived at the police station, they returned the girl to the man’s house, where the abuse continued, and they did so without speaking to the girl’s parents about their decision.
In rejecting the girl’s substantive due process claim against the officers and city, Bukowski held that she had not established an “affirmative act,” reasoning as follows:
Although in DeShaney the state returned Joshua to the ultimate aggressor, the DeShaney Court explicitly rejected the idea that such acts met the state-action requirement. The Court in De-Shaney was not merely assuming that state actors did not contribute to the hazards faced by Joshua, but it was also holding that the act of returning someone to the same dangers that existed status quo ante does not satisfy the state-action requirement.
Examining the quality of governmental involvement here, it is apparent that the government was no more involved in making Bukowski more vulnerable to private violence than it was in DeSha-ney — in both cases, the government was merely returning a person to a situation with a preexisting danger. The plaintiffs’ argument that the officials encouraged Hall by their act of returning Bukowski is really the same as the argument that the officials encouraged Hall by their refusal to get involved.
326 F.3d at 709 (emphasis added) (internal citation and quotation omitted).
A similar conclusion applies here. “Whether or not the defendants ‘acted’ may be a difficult question in the abstract, but DeShaney [and Bukowski ] make[] clear that the acts of the officials here clearly fall on the inaction side of the line.” Id. Indeed, DeShaney and Bukowski would seem to present the harder fact patterns. In both cases, the police temporarily removed vulnerable individuals from danger by taking them into custody. And when they returned the victims to the same special danger, the courts nonetheless held that no liability ensued because “the government was merely returning a person to a situation with a preexisting danger.” Id. at 709; DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (“That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father’s custody, it placed him in no worse position than that in which he would have been had it not acted at all.”).
Here, by comparison, the police never took Jones into custody and (so far as the record shows) never had any interaction with her at all. In point of fact, neither party has presented any evidence that Denise Jones was even at the scene when the officers arrived. But even if she was there at that time, both parties agree that *694 she stood on the sidewalk, was almost 266 yards from the start of the race, was still farther from the Lincoln Park Palace parking lot (where the two police cars were parked) and was well within the jurisdiction of the City of Detroit. Under these circumstances, the most that one could say is that when the police arrived they had temporary control (or loose “custody”) of the drivers and that they could have retained that control and either stopped the race from occurring (assuming of course that they had jurisdiction over this street) or at least urged the drivers not to race. As in DeShaney and Bukowk-si, they chose not to retain that control and “placed [the drivers and spectators] in no worse position than that in which [they] would have been had [the officers] not acted at all.” 489 U.S. at 201, 109 S.Ct. 998; id. (“While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in then-creation, nor did it do anything to render him any more vulnerable to them.”).
Even if an officer bet on the drag race, as one spectator alleges, and even if the officers played rap music for 15 minutes rather than 2 minutes, as other spectators allege, that does not change matters. While such conduct certainly would not have discouraged the participants from proceeding with the race, it also cannot be said that it placed the drivers or spectators in greater danger than if the police had never arrived. As deeply regrettable and ultimately tragic as the officers’ actions were, no evidence suggests that their conduct altered the risk of harm to Denise Jones. See McQueen, 433 F.3d at 466 (“[J]ust as the plaintiffs in Cartwright and Bukowski would have faced at least the same danger if the police had not acted, Doe would have faced the danger of Smith drawing his gun and firing at her even if [her teacher] had not acted.”).
Further breaking the link between the officers’ actions and Jones’ death is the uncontested fact that the officers played no role in Jones’ decision to attend the drag race. Unlike the victims in DeShaney and Bukowski, who not only each were temporarily in the custody of the State but also faced age and disability restrictions in their ability to care for themselves, the officers never met Jones (much less took custody over her) and no one has offered any evidence as to why she could not have looked after herself in choosing whether to be a spectator at a dangerous event. When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the “state” has “created” the “danger” to her by its affirmative acts. See Summar v. Bennett, 157 F.3d 1054, 1059 n. 2 (6th Cir.1998) (rejecting claim because decedent’s “voluntary decision to become a confidential informant with all the dangers it presented, not to mention his poor decision to fraternize with criminals in the first place, played a much greater role in his unfortunate demise”); Robinson, 2005 U.S.App. LEXIS 15003, at *14-15 (“[T]he causal relationship between the officers’ assurances of safety and Robinson’s murder is tenuous in light of intervening choices made by the decedent. The officers ... did not force or instruct the decedent to remain in the building.”); Peach, 93 Fed.Appx. at 693 (“[I]t was [the decedent] who independently and voluntarily chose to visit, camp with and stay with Carr after the County issued the order of protection .... This undisputed fact also serves to break any alleged link between the murder and the actions of the Smith County defendants.”).
Attempting to alter this conclusion, Jones points to several other decisions. None is convincing. “[W]ith respect to non-custodial cases,” one of them, Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir.1987), “[is] no longer an accurate *695 statement of the law after DeShaney and Collins," Stemler v. City of Florence, 126 F.3d 856, 869 (6th Cir.1997), and at any rate involves the risk-creating act of allowing an inmate to drive a police car unsupervised, Nishiyama, 814 F.2d at 279. Another, Davis v. Brady, 143 F.3d 1021 (6th Cir.1998), was cited for the first time in Jones’ reply brief, where new arguments may not be made, Rush v. Ill. Cent. R.R. Co., 399 F.3d 705, 727 n. 19 (6th Cir.2005). Like Nishiyama, at any rate, Davis involves the risk-enhancing (if not custodial) act of taking an intoxicated individual into custody, then leaving him on the side of a busy highway far from town. 143 F.3d at 1023. The remaining two cases, Dwares v. City of New York, 985 F.2d 94 (2d Cir.1993), and Reed v. Gardner, 986 F.2d 1122 (7th Cir.1993), also appear for the first time in the reply brief and are from other circuits to boot. Both cases, moreover, involved victims who faced little danger before the police intervened and greater peril after the police acted. See Dwares, 985 F.2d at 100 (holding that an affirmative act had been established when police told “skinheads” that they would not intervene if they beat up demonstrators participating in a fully licensed rally because the police were providing security for the demonstrators); Reed, 986 F.2d at 1126 (holding that an affirmative act had been established when police arrested a sober driver, took her into custody and left her visibly drunk husband to operate the car).
The dissent raises several other points that deserve consideration. What would happen if the officers had not merely said they would decline to stop the race but instead had actually participated in the race — for example, by waving a flag to signal the start of the race, by doing the play-by-play for the race or by driving one of the cars in the race? Dissent Op. at 701. We agree that these examples likely would state a constitutional claim but not because they would establish a claim under DeShaney. Had the officers organized or participated in this race, the issue would cease to turn on whether they were responsible for harm caused by a private actor and would turn instead on whether they had caused the harm themselves. See County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that officers will be liable under the Due Process Clause for injuries caused by “grossly negligent” or “reckless” conduct that “shock[s] the conscience”).
Under these circumstances, we would have no reason to determine whether the officers had increased the risk of harm to the victim because they would be the source of that risk. Here, however, Jones has not alleged that the officers had anything to do with the organization of the race or that they participated in it. All of which explains why plaintiff has not presented this case as one in which the officers directly harmed Denise Jones but rather as one in which they allowed private actors to harm her. Yet in order to establish a state-created danger under our case law, plaintiff must show that the state actor increased the risk of harm to the victim — namely, by showing that the government did more than “merely returning a person to a situation with a preexisting danger.” Bukowski, 326 F.3d at 709.
In some circumstances, we agree, an officer’s encouragement of private illegal acts may state a constitutional claim, but that is because in some circumstances such encouragement will increase the risk of harm to the victim and because in some circumstances private misconduct will become public misconduct when it occurs at the prompting of public officials. Yet, as shown, plaintiff has not claimed — and cannot tenably claim on this record — that the *696 officers’ actions either created or increased the risk of harm to Denise Jones. In marked contrast, if an officer (inexplicably) had encouraged the assailant in Bukowski to rape the victim or if an officer (inexplicably) had encouraged the father in De-Shaney to beat his son, both officers plainly would have increased the risk of danger to the victims. See Dissent Op. at 703. The same simply is not true here. By allegedly choosing not to stop the race and by allegedly saying to the drivers that they “could go ahead and race,” JA 1042, the officers acted irresponsibly but they did not increase the risk of harm facing Denise Jones and the 150 or so other people that chose voluntarily to attend the race. For like reasons, Pena v. DePrisco, 432 F.3d 98 (2d Cir.2005), does not lead to a different conclusion. There, by continually condoning excessive drinking and driving over the course of an evening, the officers increased the risk that their fellow officer would cause harm.
As DeShaney and Bukowski both show, the time frame for assessing whether an affirmative act has occurred is not after the officers have arrived and temporarily taken control of the situation but before the officers have arrived. In both decisions, the officers took custody of the vulnerable victims and removed the risk of harm to them and only later returned them to the same risk they had faced before their arrival. Were it true that the question whether the officers increased the risk of harm to the victim must be answered from a different vantage point— namely, after the officers have arrived on the scene and temporarily removed the risk of harm, see Dissent Op. at 702 - 03— DeShaney and Bukowski would have come out differently. Both decisions involved fact patterns in which the officers plainly increased the risk of harm to the victims— if, that is, the proper vantage point is after, not before, the officers arrived. Instead, however, both decisions rejected the claims, concluding that “the government was merely returning a person to a situation with a preexisting danger.” Bukowski, 326 F.3d at 709; DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (“That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father’s custody, it placed him in no worse position than that in which he would have been had it not acted at all.”). See also Cartwright, 336 F.3d at 493 (“The question is not whether the victim was safer during the state action, but whether [she] was safer before the state action than [she] was after it.”).
All things considered, Jones “cannot show” what our cases require — “that defendant officers created or increased the risk that [Jones] would be struck by a vehicle.” Cartwright, 336 F.3d at 493. Because Jones has failed to establish a cognizable “affirmative act,” we must reject her claim against the officers as a matter of law.
2.
Jones also has failed to show that the district court erred in holding that she did not satisfy the second prong of this claim — the “special danger” requirement. A special danger exists “where the state’s actions place the victim specifically at risk, as distinguished from a risk that affects the public at large.” Kallstrom, 136 F.3d at 1066. In the only cases where we have recognized a “state created danger,” the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims. See Caldwell v. City of Louisville, 120 Fed.Appx. 566, 573 (6th Cir.2004) (concluding that where the threat posed by an abusive husband was only to his wife, the state action “placefd] the victim specifically at risk”); Waller v. Trippett, 49 Fed.Appx. *697 45, 50 (6th Cir.2002) (concluding that public employees working in a prison kitchen were a “limited and specifically definable group,” satisfying the special-danger requirement); Duvall v. Ford, 187 F.3d 635 (6th Cir.1999) (dismissing on grounds of no affirmative act but acknowledging specific endangerment where a prisoner incarcerated for abusing his wife escaped and fired shots into the trailer where she was living, injuring a family member); Kallstrom, 136 F.3d at 1067 (releasing the personnel files of undercover officers, including information about their families and homes, to defense attorneys specifically endangered the officers and their families).
When by comparison the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the “state created danger” theory. See Schroder v. City of Fort Thomas, 412 F.3d 724, 729 (6th Cir.2005) (failing to enforce or lower the speed limit on a residential street “did not create a ‘special danger’ to a discrete class of individuals (of which the Schro-ders’ son was a member), as opposed to a general traffic risk to pedestrians and other automobiles”); Jones v. City of Carlisle, 3 F.3d 945, 949-50 (6th Cir.1993) (holding that an epileptic driver was “no more a danger to [the plaintiff] than to any other citizen on the City streets”); Janan v. Trammell, 785 F.2d 557, 560 (6th Cir.1986) (holding that the release of an inmate on parole, who 'eventually murdered a citizen, did not violate the Due Process Clause because “there is [no] showing that the victim, as distinguished from the public at large, faces a special danger”); see also Bullard, 126 Fed.Appx. at *720 (holding that a public-housing resident threatened by poor security in her building could “not meet th[e] very high burden of proving that the state knew or should have known that its actions specifically endangered the plaintiff’) (internal quotation marks omitted); Kennerly v. Montgomery County Bd. of Comm'rs, 257 F.Supp.2d 1037, 1044 (S.D.Ohio 2003) (“[A] plaintiff cannot merely ... nam[e] a more particular subclass of the public as the group to which the government owed a duty, such as one’s ‘neighbors.’ Neighbors are still the public. Kallstrom is not ambiguous: the government must be aware that its actions will increase the vulnerability of a specific individual to criminal danger.”).
Jones cannot satisfy this standard. The officers never interacted with Denise Jones. No evidence has been put forward suggesting that the officers had any reason to know that they were putting her at risk by their action/inaction that night. And witnesses to this tragedy estimated that the crowd contained at least 150 people at the time of the race. ' That figure plainly is more than a handful of people specially put at risk by state action or inaction. And, indeed, it is not unlike the number of people put at risk when the police allegedly failed to enforce a speed limit on a residential street. See Schroder v. City of Fort Thomas, 412 F.3d 724 (6th Cir.2005). In Schroder, we concluded that there was no special danger despite the fact that Mrs. Schroder had been campaigning for a reduced speed limit (or better enforcement of the current speed limit) on a particular stretch of a residential street on which her family lived and despite the fact that the boy killed was in fact Schroder’s son because the threatened group (people who lived on the street) was not sufficiently “discrete.” Id. at 729. Nor does McQueen v. Beecher Community Schools, 433 F.3d 460 (6th Cir.2006), alter this conclusion. There, the victim was one of “five children[] left in a room alone with an armed classmate.” Id. at 468. Unlike the crowd of at least 150 people lining the drag race route, a handful of students were endangered by the teacher’s conduct, and *698 their identities were clear to the teacher at the time she acted (or did not act). Likewise unavailing is Mitchell v. Duval County School Board, 107 F.3d 837, 839 (11th Cir.1997), which concluded “that the pleadings nevertheless failed to present facts sufficient to give rise to liability under the special danger theory” in part because the danger to the victim was not “distinguishable from that [to] the general public.” Id. at 839-40. Indeed, we are not aware of any case from our circuit, or any other, in which a “special danger” was found with respect to a group of 150 people allegedly placed “specially” at risk by state action. Jones’ claim thus independently fails on this ground as well.
C.
Even if there were doubt about these conclusions, it is clear at a minimum that Jones has not shown a violation of constitutional rights that were “clearly established” at the time of the officers’ action/inaction. No authority from our circuit extant at the time of the incident even begins to suggest that the 150 people at the drag race would satisfy the “special danger” requirement. And no authority from our circuit supports the theory that the officers committed a cognizable affirmative act when they did not create or increase the danger to Denise Jones that she voluntarily undertook before they arrived.
III.
In view of these conclusions, Jones’ claim against the City of Lincoln Park also fails as a matter of law. “[T]he determination that the City’s officials did not violate the plaintiffs’ constitutional rights resolves the claim against the City as well.” Bukowski, 326 F.3d at 712-13. Accordingly, whether it was the policy of the department not to stop drag races occurring in Detroit (as Jones claims) or whether state law prevented the department’s intervention (as the City claims) makes no difference to the outcome of this dispute. That the officers did not violate Denise Jones’ constitutional rights eliminates any potential derivative liability of the City.
í]5 5jS í}í
As is so often true in “state created danger” cases, there is much to lament about what happened here. The Lincoln Park police officers behaved exceedingly badly. The drivers had no business racing their cars on Detroit city streets. And Denise Jones exercised poor judgment in attending the race.
The most grating feature of this calamity, however, is that the police, a group upon whom we rely for public safety, had only to exercise reasonable judgment, indeed even below-average judgment, to prevent October 8, 2001 from being anything other than a late-night out for Denise Jones. Yes, the Lincoln Park officers did not have jurisdiction over Detroit city streets. Yes, their lack of jurisdiction over Detroit city streets makes one wonder whom the officers could reasonably assure that this illegal drag race would not be prosecuted — as in fact it eventually was. And yes, as the Michigan courts held, the “proximate cause” of this accident was the actions of the drivers, not the officers. See Jones v. Reynolds, 2005 WL 782694 at *6 (Mich. Cir. Ct. April 7, 2005). But by expressly allowing the about-to-begin race to proceed, if not encouraging it to proceed, the officers gave law enforcement a bad name.
Faced with these kinds of assertions, it is tempting to say that they satisfy the “state created danger” doctrine. But, to do so, we would have to say that the doctrine covers conduct it does not — that it *699 covers state action that does not create or increase the risk of danger to the victim and that it applies to state action that does not specifically increase the risk of danger to a discrete individual or group of individuals. And even were we to move the doctrine in these directions, that would not advance this claim because the very act of modifying these rules would defeat plaintiffs obligation to show that the officers violated “clearly established” law. While we decline to extend the doctrine in this case, nothing in our decision prevents future litigants from arguing what the plaintiff has not argued here — that the alleged actions of the officers converted the private misconduct of the drivers into public misconduct and in the process converted this claim into a direct-injury constitutional claim under the Lewis, as opposed to De-Shaney, line of cases.
As DeShcmey reminds us, moreover, our decision does not prevent the Michigan legislature from creating “a system of liability” that “would place upon the State and its officials the responsibility” for conduct like this. 489 U.S. at 203, 109 S.Ct. 998. But if the Supreme Court refused to “thrust” such liability upon the State under the Due Process Clause in a case in which the public officials returned a helpless child to his abusive father, only to have him beaten repeatedly until “he suffered brain damage so severe that he is expected to spend the rest of his life confined to an institution,” DeShaney, 489 U.S. at 192-93, 203, 109 S.Ct. 998, and if the fact pattern presented here likewise shows that the “State” did not “create” this “danger,” we are not comfortable imposing such liability here.
rv.
For these reasons, we affirm.